# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-16-170-R** |
| | ) | |
| **LAND O'LAKES, INC., and** | ) | |
| **CUSHING, OKLAHOMA** | ) | |
| **BROWNFIELDS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Three decades ago, the United States settled claims with Hudson Oil Refining Company for Hudson's alleged violations of the Resource Conservation and Recovery Act (RCRA) that occurred through the operation of its Oklahoma Refinery. Now, years later, the United States has returned to recoup costs it has incurred and apparently will incur in cleaning up hazardous materials that were released before Hudson owned the Refinery. Yet it seeks to recover not under RCRA, but under an entirely different statute—the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)— and not from Hudson, but from the party that owned the Refinery before Hudson: Defendant Land O'Lakes, Inc.[1] Defendants insist the Government's CERCLA claims are precluded for a variety of reasons. The Government counters by asking this Court to dismiss Defendants' two counterclaims and to strike eight of its affirmative defenses. (Doc.

---

[1] The other Defendant, Cushing, Oklahoma Brownfields, LLC, is merely the entity created by Land O'Lakes to hold title to the Site, thereby providing access for cleanup.

34). Defendants have also moved to strike a portion of the Government's Reply brief that it deems procedurally improper. (Doc. 50). For the reasons that follow, the Court GRANTS the Government's Motion (Doc. 34) and DENIES the Defendants' Motion (Doc. 50).

## BACKGROUND

**Hudson's Civil Suit Settlement over the Cushing Refinery**

Call it an ill-fated omen that the small creek of ominous name in Cushing, Oklahoma, was collecting discharge from the local oil and gas refinery. Skull Creek, which winds through the eastern portion of the now-defunct Hudson Oil Refinery Site, had historically received waste from the Refinery. And though the Refinery produced liquid propane gas, gasoline, aviation fuel, diesel fuel, and other fuel oils over the course of its history from 1915–1982, it had not always been in the hands of Hudson. A company called Midland Cooperative Wholesale owned and operated at least part of the Site from 1943 to 1977, during which it allegedly released several hazardous substances that the Government argues now make Midland, or rather its successors—the current Defendants—liable under CERCLA.[2] It was not until 1977 that Midland sold the Site to Hudson.

Evidently, Hudson's operation of the Site, which ceased in 1982, did not comply with federal law either. The Environmental Protection Agency (EPA) sued Hudson two years later for violating the hazardous waste management requirements of RCRA, 42 U.S.C. § 6901-92k. Of note, RCRA was the Government's sole cause of action in that case;

---

[2] To be clear, Midland could not have been in violation of CERCLA at the time it operated the Refinery; CERCLA did not become effective until December 11, 1980. *See United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 731 (8th Cir. 1986). CERCLA does apply, however, retroactively. *Id.* at 732 (finding that it "is manifestly clear that Congress intended CERCLA to have retroactive effect").

it brought no claims under CERCLA or any other statute. Eventually, though, the EPA and Hudson resolved these claims through settlement. In 1987, this Court entered a Final Consent Decree that required Hudson to undertake RCRA corrective action (i.e., clean-up) activities at the Refinery. *See United States of America v. Hudson Refining Co., Inc., and Hudson Oil Co., Inc*., No. CIV–84–2027–A (W.D. Okla. 1984) at Doc. 14, Ex. 9. Though each party challenges the other's interpretation of the Decree, its express terms included that the "United States hereby covenants not to sue Defendants and their successors and assigns of the Cushing Refinery for corrective action claims under Section 3008(h) of RCRA, 42 U.S.C. § 6928(h) . . . ." *Id*. The Government's suit with Hudson came to a close in 1994 when this Court, finding that Hudson had satisfied the conditions of the Consent Decree, entered an Order for Closure of the 1987 Consent Decree and released Hudson from further obligations.

**Hudson's Bankruptcy**

Hudson, in the meantime, faced financial strains. Along with its related companies, it filed Chapter 11 Bankruptcy in 1984 in the U.S. Bankruptcy Court for the District of Kansas. Those proceedings, in which both the Government and Land O'Lakes were creditors and which spanned a number of years, brought about three orders that Land O'Lakes insists are relevant in deciding the Government's Motion today. First, the Bankruptcy Court in 1989 approved a sale of the Cushing Refinery free of all liens and claims. (Doc. 14, Ex. 1). Second, it confirmed a Chapter 11 reorganization plan the following year. (Doc. 14, Ex. 2). And third, it entered its Final Decree in June 1996, finding that "the property dealt with by the Plan is free and clear of all claims and interests of

creditors of the Debtor." (Doc. 14, Ex. 3). Land O'Lakes had held a $5 million mortgage against the Cushing Refinery. After negotiation with the EPA and sale of the Refinery, Land O'Lakes apparently received $1,755,000 from sale proceeds. In any event, with the entering of the Final Decree, the bankruptcy estate of Hudson was closed.

**The EPA's Response Actions**

Yet as of 1995, there were still issues surrounding the old Hudson Refinery: the EPA's testing revealed that the Site had never been entirely decontaminated. So in 1998, the EPA initiated an emergency removal action at the Site pursuant to § 104(a) of CERCLA, 42 U.S.C. § 9604(a)(1).[3] Clean-up, inspections, and investigations continued through December 1999. Not surprisingly, the EPA wanted reimbursement for these removal costs and wanted a CERCLA Remedial Investigation and Feasibility Study done at the Site to ascertain the need for further action. To that end, it sent Defendant Land O'Lakes a Special Notice and Demand Letter, pursuant to § 107 of CERCLA. That provision provides that the owner or operator of a facility (or a person who owned or operated a facility) that disposed of hazardous substances will be liable for the costs of removal or remedial actions incurred by the Government. 42 U.S.C. § 9604(a)(1)-(2).

To be sure, Land O'Lakes had nothing to do with the Government's earlier civil action against Hudson. Rather, in 1982 Land O'Lakes had merged with Midland Cooperative Wholesale, the prior owner of the Refinery. The Government's Demand Letter

---

[3]§ 104(a) permits the President (and by extension, the EPA) to take remedial and removal action whenever "any hazardous substance is released or there is a substantial threat of such release into the environment, or . . . there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to public health or welfare . . . ."

sought to recover costs incurred in cleaning up substances allegedly released during Midland's pre-1977 operation of the facility. Land O'Lakes, arguing it had no liability at the Site, declined to clean up the Site. So the EPA conducted additional CERCLA removal from 2001 to 2003, and along with the Oklahoma Department of Environmental Quality, performed a Remedial Investigation and Feasibility Study from 2004 to 2007 to identify possible remedies for cleaning up the Site. After the EPA incorporated those findings into a CERCLA Record of Decision that identified the final cleanup remedies for the Site, it sent yet another Special Notice to Land O'Lakes directing it to carry out those remedies. Once more, Land O'Lakes said no. In response, the EPA issued Land O'Lakes a unilateral administrative order (UAO) under § 106(a) of CERCLA, 42 U.S.C. § 9606(a), requiring Land O'Lakes to perform the remedial design and action work at the Site.[4] With little choice—§ 9606(b) dictates that refusal can result in a fine of $25,000 per day—Land O'Lakes alerted the EPA in February 2009 that it intended to comply with the UAO.[5] To do so, Land O'Lakes then formed Cushing, Oklahoma Brownfields, LLC, a week later to acquire the Site to enable clean up. Brownfields still holds title to the majority of the Site.

Clean up continued until 2015 with the EPA overseeing Land O'Lakes' work under the 2009 UAO. Finally, in June 2015, the United States formally demanded CERCLA

---

[4] CERCLA authorizes the EPA to issue these orders when the EPA determines there "may be an imminent and substantial endangerment to the public health or welfare or the environment" because of actual or threatened release of hazardous substances from a facility. 42 U.S.C. § 9606(a).

[5] Land O'Lakes complied because it could not challenge the UAO in court at that time: CERCLA "provides that 'no Federal court shall have jurisdiction . . . to review any order issued under section [106]' until the [potentially responsible party] completes the work and seeks reimbursement, [42 U.S.C.] § 9613(h), or until the EPA brings an enforcement action or seeks to recover fines and damages for noncompliance, [42 U.S.C.] § 9613(h)(1)(2)." *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 115 (D.C. Cir. 2010).

reimbursement costs of $23,424,243.76 allegedly incurred by the EPA in cleaning up the Site through February 28, 2015, plus interest in the amount of $4,818,215.45.

**The Civil Suits Between Land O'Lakes and the United States**

Rather than pay these amounts, Land O'Lakes sued the Government, seeking a declaratory judgment that it was not liable to the Government for past costs to clean up the Site under CERCLA and asserting a citizen-suit claim under RCRA. This Court dismissed that suit for lack of subject matter jurisdiction: CERCLA "bar[red] subject matter jurisdiction over [Land O'Lakes'] claims unless and until the EPA file[d] a cost recovery claim under § 107 of CERCLA. At that time, [Land O'Lakes] could pursue these claims as defenses to liability under CERCLA." *Land O'Lakes, Inc. v. United States*, No. CIV-15-683-R, 2016 WL 552966, at *3 (W.D. Okla. Feb. 10, 2016).[6] Now the EPA has done just that. Alleging that Land O'Lakes (through its predecessor Midland) released hazardous substances at the Site before 1977 (when it sold the Refinery to Hudson), thereby inviting liability under CERCLA,[7] the Government seeks the recovery of costs that it either has incurred or will incur in cleaning up the Site. In response, Defendants assert two counterclaims and several affirmative defenses. The Government asks this Court to strike several of those affirmative defenses and to dismiss the two counterclaims. (Doc. 34).

---

[6] Subject matter jurisdiction was lacking because, under 42 U.S.C. § 9613(h), federal courts do not have jurisdiction to immediately review unilateral administrative orders calling for remedial activity like the one issued to Land O'Lakes. *See, e.g., Cannon v. Gates*, 538 F.3d 1328, 1333 (10th Cir. 2008) (finding that "this clear and unequivocal provision [§ 9613(h)] is a blunt withdrawal of federal jurisdiction over challenges to ongoing CERCLA removal actions") (internal quotes omitted).

[7] Specifically, the Government alleges violations under §§ 101(22), 101(29), and 107(a) of CERCLA, 42 U.S.C. §§ 9601(22), 9601(29), and 9607(a).

Defendants have also asked this Court to strike a portion of the Government's Reply brief that they allege is procedurally improper. (Doc. 50).

## DEFENDANTS' MOTION TO STRIKE

The Court first takes up Defendants' Motion to Strike a portion of the Government's Reply (Doc. 49) that Defendants argue is procedurally improper for the Government's failure to raise the issue in its original Motion to Strike. By way of background, the Government originally asked the Court to strike Defendants' affirmative defenses that were based on the Government's civil settlement with Hudson. When Defendants responded by arguing that the Government failed to grasp that Hudson's earlier bankruptcy proceedings barred this CERCLA action, the Government's Reply then requested the Court strike Defendants' affirmative defenses that relied on the bankruptcy proceedings—defenses three, four, five, and six.

"[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief." *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009); see also *Wheeler v. Comm'r,* 521 F.3d 1289, 1291 (10th Cir.2008) ("issues raised by an appellant for the first time on appeal in a reply brief are generally deemed waived"). That said, the exception to the rule is when "the new issue argued in the reply brief is offered in response to an argument raised in the [defendants'] brief." *Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1166 n.3 (10th Cir. 2003). Here, the Government originally moved to strike Defendants' *Hudson*-settlement-affirmative defenses (seven through ten), never mentioning the impact of the bankruptcy proceedings. In response, Defendants, arguing that the Government's motion ignored the impact of the bankruptcy

proceedings, devoted half of their brief to explaining why the Orders from the bankruptcy case bar this CERCLA action. Defendants opened the door to a decision on the impact of the bankruptcy proceedings. Defendants' Motion to Strike is therefore denied.

## THE GOVERNMENT'S MOTION TO STRIKE

The Government has moved to strike Defendants' affirmative defenses three through ten. Defenses seven through ten all argue, in some form or fashion, that the United States' 1987 settlement with Hudson, specifically the Consent Decree entered by the Court, bars the United States from bringing its CERCLA claims. Because the Consent Decree does not provide Defendants with any release of liability on potential CERCLA claims, those affirmative defenses must be stricken as a matter of law. Similarly, Defendants affirmative defenses three through six contend that orders entered by the Court in Hudson's bankruptcy proceedings preclude the Government's case. Those arguments are legally insufficient and are stricken as well.

**Standard of Review on a Motion to Strike**

Federal Rule of Civil Procedure 12(f) allows a court to "strike from a pleading an insufficient defense." The rule "conserve[s] time and resources by avoiding litigation of issues which will not affect the outcome of a case." *Sierra Club v. Tri-State Generation and Transmission Ass'n, Inc.*, 173 F.R.D. 275, 285 (D. Colo. 1997). It also serves "to minimize delay, prejudice, and confusion by narrowing the issues for discovery and trial." *Resolution Trust Corp. v. Schonacher*, 844 F. Supp. 689, 691 (D. Kan. 1994). And in deciding a motion to strike an affirmative defense, "the Court must examine each affirmative defense at issue to ascertain whether any question of fact or law is raised by the

defense. If a defense raises such a question, then the motion to strike is improper and the issue must be decided subsequently on the merits, when more information is available." *United States v. Hardage*, 116 F.R.D. 460, 463 (W.D. Okla. 1987). The decision to strike a defense, however, remains "within the district court's sound discretion." *Unger v. U.S. West, Inc.,* 889 F.Supp. 419, 422 (D. Colo. 1995). That said, insufficient defenses may be stricken where, "as a matter of law, the defense cannot succeed under any circumstances." *F.D.I.C. v. Isham*, 782 F. Supp. 524, 530 (D. Colo. 1992). And in particular, "[i]t is not unusual . . . for courts to use a motion to strike for dealing with insufficient defenses raised in CERCLA cost recovery actions." *Kelley v. Thomas Solvent Co*., 714 F. Supp. 1439, 1442 (W.D. Mich. 1989).

**Land O'Lakes' Affirmative Defenses Seven, Eight, and Ten**

Three of Land O'Lakes' affirmative defenses center on the civil-suit settlement between Hudson and EPA, specifically the Consent Decree entered by the Court in 1987 and the Closure Order entered in 1994. Because those defenses flow from a plain misreading of the those Orders, all must be stricken under Rule 12(f) for lack of sufficient legal basis: the Government never covenanted not to sue for CERCLA violations, and in any event, the Government expressly reserved the right to sue under other federal statutes such as CERCLA.

A consent decree, such as the one entered in the *Hudson* case, is simply "a negotiated agreement that is entered as a judgment of the court." *Sinclair Oil Corp. v. Scherer*, 7 F.3d 191, 193 (10th Cir. 1993). It is an order "to be construed for enforcement purposes basically as a contract," meaning that "the terms of the decree and the respective

obligations of the parties must be found within the four corners of the consent decree." *Id*.at 194. With that in mind, the Court turns to the Defendants' affirmative defenses predicated on the 1987 Consent Decree.

First consider Defendants' seventh affirmative defense: that Land O'Lakes "is covered by, and the beneficiary of, the protections from environmental liability it received in the Lawsuit Orders [the Consent Decree and Closure Order] regarding the [Cushing Refinery] Site." (Doc. 14, at 26). As evidence of their status as beneficiaries under the Consent Decree, they point to the Consent Decree's condition that "United States hereby covenants not to sue Defendants **and their successors and assigns** of the Cushing Refinery for corrective action claims under Section 3008(h) of RCRA, 42 U.S.C. § 6928(h), **for conditions addressed in the United States' Second Amended complaint that were known by the United States and existing as of the date of lodging of this decree.**" (Doc. 14, at 26) (emphasis in original). Also relevant, they insist, is the Consent Decree's provision that the covenant not to sue "shall be applicable to Defendants' immediate predecessor in interest of the Cushing Refinery." (*Id*.). In other words, Defendants contend the Government covenanted not to sue them under CERCLA because it agreed in the *Hudson* settlement not to sue Hudson's immediate predecessor in interest (allegedly Land O'Lakes) and its successor (allegedly Brownfields) for any corrective actions based on conditions known by the United States at the time of the lawsuit with Hudson.

But that wasn't the deal; Land O'Lakes inflates the United States' covenant-not-to-sue to a degree to which it did not consent. The Government merely contracted not to sue

"for corrective action claims under *Section 3008(h) of RCRA*." (emphasis added). This suit arrives under CERCLA.[8]

Like Defendants' seventh defense, Defendants' eighth springs from a similar misinterpretation of the Consent Decree. According to Defendants, Land O'Lakes (as the immediate predecessor in interest to Hudson) and Brownfields (as the successor and assign to Hudson), may fully enforce the Court's 1994 Closure Order releasing Hudson—and by extension them—from any further clean-up obligation under the 1987 Consent Decree. Again, the Consent Decree's limited scope does not apply to Land O'Lakes or Brownfields with regard to the Government's current CERCLA claim. The Final Closure order merely incorporates the Consent Decree; it does not widen the scope of the Government's covenant not to sue.

Neither of these Orders supports Defendants' tenth defense either, which claims that the Government's failure to raise or reserve any right to assert a CERCLA claim in subsequent litigation in the Consent Decree and Closure Order in the Lawsuit" constitutes waiver or estoppel. That contention flies in the face of the Consent Decree's "Retention of Enforcement Rights" section: "Except as specifically provided herein, Plaintiff does not waive any rights or remedies available to the United States for any violation by Defendants

---

[8] And while RCRA and CERCLA are not at odds, they do serve different purposes. "RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). "Unlike [CERCLA], RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards." *Id.* "RCRA's primary purpose, rather, is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and environment.'" *Id.* (quoting 42 U.S.C. § 6902(b)).

or their successors of federal or state laws, regulations, or permitting conditions." (Doc. 14, Ex. 9, at 22).

Citing no case law, Defendants maintain that provision is ineffective because it omits any reference to CERCLA and retained enforcement rights only "for any violation by Defendants or their successors"—with no specific mention of applicability to the immediate predecessor in interest, Land O'Lakes. Yet no authority suggests the Government was required to list out every possible federal statute under which it was reserving the right to sue. And that should come as no surprise: Defendants' argument would essentially permit the Government to reserve claims only by naming the particular statute under which it might one day sue and the precise party against whom judgment might one day be sought. That seems overblown given the sole purpose of the Consent Decree was to settle claims between two parties that were brought under a single statute.

Put simply, neither the Consent Decree nor the Closure Order bars the Government's CERCLA claims. As this Court already noted in its Order dismissing Land O'Lakes claims for want of subject matter jurisdiction, the "EPA did not covenant not to sue Hudson or its successors or assigns for CERLA claims." *Land O'Lakes, Inc. v. United States*, No. CIV-15-683-R, 2016 WL 552966, at *1 (W.D. Okla. Feb. 10, 2016). Further, "the 1987 Consent Decree and 1994 Closure Order were entered under § 3008(a) and (g) of the RCRA and do not even reference CERCLA." *Id*. at *3.

Defendants offer several arguments in response: the Government knew it would one day sue under CERCLA; it should have brought its CERCLA claims in 1984; the Government cannot reserve the right to sue under other federal statutes; the *Hudson*

settlement was meant to avoid future litigation such as this. Yet none of these points saves Defendants' defenses because the Tenth Circuit rejected these very arguments in *Sinclair Oil Corp. v. Scherer.* 7 F.3d 191 (10th Cir. 1993). Like Hudson, Sinclair had previously entered into a consent decree with the EPA stemming from the operation of its refinery. *Id*. at 192. Later, the EPA sued and assessed penalties for violating RCRA waste-disposal restrictions. And like here, Sinclair argued the earlier consent decree shielded it from any liability. *Id*. at 193. The Tenth Circuit disagreed: there was no mention of resolving RCRA waste-disposal claims in Sinclair's earlier consent decree with the EPA. *Id.* at 194 ("The counts of the administrative penalty action involving the alleged [waste-disposal violations] are not mentioned anywhere in any of the pleadings filed in the consolidated case."). As a result, those counts were "not part of the claims and the complaints filed by the parties or the violations alleged therein which were resolved by entry of the consent decree." *Id*. (internal quotes omitted). Nor did it matter that the Government knew about— and did not resolve—these RCRA violations when it entered into the consent decree with Sinclair. That decree "had nothing whatever to do with known, but not yet charged, alleged violations arising from Sinclair's transport and disposal [of the waste]." *Id.* It was also immaterial that the litigants—both of which "knew of the existence of the facts underlying the [new] counts"—were aware that the "consent decree was likely to be followed by another round of litigation." *Id*. at 196. After all, the consent decree had not resolved those matters. What is more, the EPA's claims could proceed because the EPA had reserved the right to commence administrative or judicial actions for alleged violations of other federal statutes, including RCRA. *Id*. at 195.

So too here. "The parties did not expressly resolve the presently alleged violations in the consent decree and we cannot rewrite their agreement to include additional matters." *Id*. "[Hudson] could have bargained but did not, to specifically include in the decree all of the alleged violations of [CERCLA] that were known to the EPA on the date the consent decree was signed." *Id.* This outcome makes sense: if Sinclair could not use *its own* earlier consent decree to shelter it from new liability, it is difficult to see how Defendants can use Hudson's consent decree, particularly given the fact that Brownfields did not exist at the time of settlement and Land O'Lakes was in no way involved in the *Hudson* case.

Defendants nonetheless object that *Sinclair* is useless here because, one, Sinclair never raised the defense of res judicata, and two, the Government's reservation of rights "is not specific or unequivocal." (Doc. 43, at 27). That first point overlooks one of *Sinclair*'s holdings: if a consent decree does not resolve a specific claim, it is immaterial that the Government might know of facts that could lead to new claims later on. As for its second point, Land O'Lakes offers no precedent that holds, or let alone implies, that the Government was required to reserve its right to sue under every possible statute under which Hudson or its related entities could one day be found liable.

**Land O'Lakes Ninth Affirmative Defense**

Defendants' ninth affirmative defense sounds in claim preclusion but falters as well. By their account, res judicata precludes the Government's CERCLA claims because the Government somehow could have raised them in both its civil case against Hudson and Hudson's Chapter 11 bankruptcy proceedings.

First, for the Government's earlier settlement with Hudson to bar its claims under res judicata, "(1) [the *Hudson* case] must have ended with a judgment on the merits; (2) the parties must be identical or in privity; [and] (3) the suit must be based on the same cause of action." *Nwosun v. Gen. Mills Rests.*, 124 F.3d 1255, 1257 (10th Cir. 1997).[9] This Court can assume without deciding that there was a final judgment on the merits. That notion is no sure thing, however, considering that the Tenth Circuit has held that "the basically contractual nature of consent judgments has led to general agreement that preclusive effects should be measured by the intent of the parties." *Satsky v. Paramount Commc'ns., Inc.*, 7 F. 3d 1464, 1468 (10th Cir. 1993) (citations omitted). The plain language of the 1987 Consent Decree—"the United States hereby covenants not to sue [Hudson] . . . for corrective action claims under Section 3008(h) of RCRA"—does not expressly preclude a CERCLA claim. As for the second element, identical parties or privity, the Court will also take as true the Defendants' assertions that they are in privity with Hudson.[10]

Yet privity and a final judgment on the merits do not by themselves bar the Government's claims. Defendants' res judicata defense is thwarted by the doctrine's third element because the present suit is not based on the same cause of action as the Government's earlier settlement with Hudson. The Tenth Circuit "embraces the

---

[9] As for the fourth element of res judicata listed by the parties—a full and fair opportunity to litigate—"the absence of a full and fair opportunity to litigate is more appropriately treated as an exception to the application of claim preclusion when the three referenced requirements are met." *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005). Here, they are not.

[10] The Government, conceding that the Court must accept as true the Defendants' assertions that they are in privity with Hudson, argues that the privity inquiry is irrelevant because the covenant not to sue does not extend to CERCLA claims. The Court agrees.

transactional approach to the definition of 'cause of action' . . . [meaning] a cause of action includes all claims or legal theories of recovery that arise from the same transaction, event, or occurrence." *MACTEC*, 427 F.3d at 832. The question is whether "the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conformed to the parties' expectations . . . ." *Petromanagement v. Acme-Thomas Joint Venture*, 835 F.2d 1329, 1335 (10th Cir. 1988).

To be clear, CERCLA imposes costs on parties that owned or operated a facility that released hazardous substances. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). Hudson's settlement with the United States in 1987 was for RCRA violations, such as lack of proper permitting and monitoring of its facilities, that occurred after Hudson bought the Cushing Refinery in 1977. Defendants were not involved in that lawsuit; they did not face any suit under RCRA, let alone CERCLA. Nor would it have made much sense for them to be. Midland, or rather Land O'Lakes, could not have been incurring further RCRA liability after it was no longer in control of the Site.

Defendants nonetheless maintain that this case and the Government's settlement with Hudson are the same cause of action because both cases arose from the environmental conditions at the Cushing Refinery that were known at the time of the *Hudson* settlement. They rely on *United States v. Gurley Refining Co.*, in which the Eighth Circuit held that the EPA, which had "chose[n] to pursue a [Clean Water Act] action in 1983," was then "precluded [] from pursuing a subsequent CERCLA action for the same wrong in 1987." 43 F.3d 1188, 1196–97 (8th Cir. 1994).

Yet *Gurley*, not binding on this Court, was more straightforward: the Government was bringing suit against an *identical party* where "the wrong for which redress [was] sought [was] the same in both actions." *Id*. at 1196. This Court can assume Defendants are in privity with Hudson, meaning there was a "substantial identity between the issues in controversy and [that] the parties in the two actions are really and substantially in interest the same." *Pelt v. Utah*, 539 F.3d 1271, 1281 (10th Cir. 2008). But it cannot accept as plausible that Hudson is the *same party* as Land O'Lakes or Brownfields. Defendants' facts do not bear that out. Land O'Lakes (though its predecessor Midland) sold the Cushing Refinery to Hudson and was even a creditor in Hudson's bankruptcy case. And Brownfields did not exist; it was only recently formed by Land O'Lakes to enable access to the Site as required under the EPA's unilateral administrative order. In the end, the Government is asserting claims (1) against new parties (2) under a different statute (3) for wrongs that occurred during a time period (pre-1977) that was not at issue in the Government's prior suit against Hudson. These suits are not one in the same.

The Government's three-decade-old-RCRA settlement with Hudson, then, does not preclude its CERCLA claims against Land O'Lakes and Brownfields today. Defendants insist, however, that if the *Hudson* settlement does not preclude the Government here, then surely Hudson's bankruptcy does. Hudson, remember, filed bankruptcy in 1984, and in the course of those proceedings, the Bankruptcy Court for the District of Kansas entered Orders that approved the sale of the Cushing Refinery, confirmed a Chapter 11 plan for reorganization, and closed Hudson's bankruptcy estate. Defendants point to two specific

provisions from the Bankruptcy Code that they believe bar the Government's CERCLA claims.

The first is 11 U.S.C. § 1141(c), which provides that "after confirmation of a [reorganization] plan, the property dealt with by the plan is free and clear of all claims and interests of creditors . . . ." Under Defendants' reading of § 1141(c), when the Bankruptcy Court approved Hudson's reorganization plan, it effectively settled all environmental claims regarding the Cushing Refinery. So by Defendants' account, § 1141 bars a creditor in bankruptcy from later bringing claims that arose pre-petition not only against the debtor *but against a fellow creditor as well.*

Nothing suggests that is the case. No doubt, if the Government was now seeking to assert a CERCLA claim against Hudson, § 1141 would preclude it. But the Government is not doing that. Instead, it asserts a claim against a creditor from the bankruptcy proceedings, which is why its cited cases do not help it here. The cases merely invoke the familiar idea that a creditor cannot recover against a debtor on a pre-petition claim. *Boston and Maine Corp. v. Mass. Bay. Trans. Auth.*, 587 F. 3d 89, 101 (1st 2009) (finding that corporate successor of debtor should have asserted a contribution claim for environmental cleanup against debtor before debtor was discharged); *In re Salina Speedway, Inc.*, 210 B.R. 851, 855–56 (10th Cir. 1997) (holding that U.S. trustee barred from asserting a claim against debtor after Chapter 11 reorganization plan was confirmed); *In re Varat Enter., Inc.*, 81 F.3d 1310, 1315–1319 (4th Cir. 1996) (ruling that two creditors bound by chapter 11 plan's disposition of the assets in debtor's estate); *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.,* 973 F.2d 474, 481 (6th Cir. 1992) (deciding parent corporation of

debtor, as a party to the bankruptcy proceedings, was thus bound by confirmation of chapter 11 plan); *In re Chateaugay Corp.*, 944 F.2d 997, 1005 (2d Cir. 1991) (CERCLA response costs incurred by EPA were prepetition claims against debtor, dischargeable in bankruptcy, regardless of when the costs were incurred); *In re Hart Oil & Gas, Inc.,* 534 B.R. 35, 47 (D.N.M. 2015) (noting that "courts hold that a confirmed plan is res judicata on the estate's claims against creditors, and vice versa"). The bottom line is this: no authority, Bankruptcy Code or otherwise, says that claims between creditors vanish with the confirmation of a reorganization plan.

Nor do these claims evaporate because a bankruptcy estate is closed or the estate's assets are sold under § 363(f). Defendants, however, contend that when the Bankruptcy Court (1) entered its Order approving the sale of the Cushing Refinery "free of all liens, claims, and encumbrances" and (2) its Final Decree, in which it found that "the property dealt with by the Plan is free and clear of all claims and interests of creditors of the Debtor," this barred any CERCLA claims the Government would have against another creditor. Not the case. For one, the Final Decree simply provided that creditors are "enjoined from pursuing or attempting to pursue any action . . . *against said Debtor* or its property." The Debtor was not Land O'Lakes; it was Hudson. And the Cushing Refinery was not the property of Land O'Lakes; it was Hudson's. And two, regarding the sale of the Cushing Refinery pursuant to § 363(f), that provision simply permits a bankruptcy trustee to sell property of the debtor's estate "free and clear of any interest in such property of an entity other than the estate." Again, the provision is inapt. The Government is not asserting a claim or title to the Refinery; its claims are against Land O'Lakes for costs incurred in

remedying the Site of contaminants that were allegedly released on Midland's watch. Further, Land O'Lakes did not purchase the property; it sold it to Hudson more than ten years before. In other words, Land O'Lakes has no colorable argument that its later acquisition of the property was somehow encumbered by a third party's competing interest.

Defendants' cited cases do not persuade the Court otherwise. Once more, "a confirmed plan is res judicata on the estate's claims against creditors and vice versa." *In re Hart,* 534 B.R. at 47. This is why Defendants cited case, *Plotner v. AT&T Corp.*, is off the mark: that case merely held that the *debtor*, after a failed attempt in an earlier lawsuit, could not re-litigate her fraud claim against the party who had purchased her land pursuant to the reorganization plan. 224 F.3d 1161, 1170 (10th Cir. 2000). And of even less help is *In re Trans World Airlines, Inc.*, where the Third Circuit found that the debtor airline's immediate successor—who had purchased the airline free and clear of all claims—could not face liability on the debtor's employee's discrimination claims. 322 F.3d 283, 288–90 (3d Cir. 2003). Defendants, unlike the debtor airline's successor, did not purchase the assets of the estate free and clear of all claims. Simply put, the notion that § 1141 or § 363(f) bars the Government's claims is supported by neither the text of the statute nor case law. Given this, it is unsurprising that Defendants offer no authority for their assertion that the Government "cannot lurk in the weeds hiding a potential [CERCLA] claim . . . against another creditor . . . without expressly reserving it" in the bankruptcy case.

In essence, these res-judicata-affirmative defenses all attempt to flout two central tenets of CERCLA. The first is the plain rule that more than one person can be liable under CERCLA: liability may be imposed on "any person who at the time of disposal of any

hazardous substance owned or operated any facility at which hazardous substances were disposed of." 42 U.S.C. § 9607. Even if Hudson had faced a CERCLA claim, nothing precludes both Hudson and Land O'Lakes from being held liable if they both released hazardous substances in violation of CERCLA; they would have operated the facility and allegedly violated CERCLA at different times.[11] Now, to the extent that Land O'Lakes disputes that Midland ever released hazardous substances at the Site or that any harm caused was separate from that later caused by Hudson, those are issues for the trier of fact.

Defendants also forget that CERCLA imposes joint and several liability for potentially responsible parties. *See, e.g., United States v. Burlington N. R. Co.*, 200 F.3d 679, 696–97 (10th Cir. 1999) ("[Defendant's] interpretation disregards the common law principles of joint and several liability inherent in CERCLA's remedial scheme.") "[A] settlement [under CERCLA] does not discharge any of the *other potentially liable persons* . . . ." *Id.* at 696 (emphasis in original) (quotations omitted). The *Hudson* settlement thus in no way discharged Land O'Lakes.

**The Anti-Duplication Provisions of CERCLA and RCRA**

The last affirmative defense that the Government has moved to strike is Defendants' contention that several of the anti-duplication provisions of CERCLA and RCRA preclude the Government's claims.[12] These provisions are best addressed in turn.

---

[11] That is, assuming Defendants do not prevail on their seventeenth affirmative defense, in which they argue divisibility of harm.

[12] To be clear, Defendants package this defense as a counterclaim in their Answer. (Doc. 14, at 77). But because Defendants point to the provisions as an outright shield to CERCLA liability, the Court takes up this issue along with Defendants' other affirmative defenses.

First, Defendants assert that 42 U.S.C. § 6905(b)(1) bars the Government from obtaining double recovery against Land O'Lakes and Brownfields. Even if the Government had already recovered against Land O'Lakes and Brownfields, the § 6905(b)(1) argument is still not viable. That provision just requires the EPA to "integrate all provisions of this chapter for purposes of administration and enforcement and [to] avoid duplication, to the maximum extent practicable, with" other environmental statutes such as the Clean Air Act, the Safe Drinking Water Act, and "other Acts of Congress" under which the EPA has regulatory authority. In fact, "Section 6905(b) creates no rights in defendants to resist regulation; rather it constitutes an exhortation to the EPA to avoid unnecessary and overlapping regulation. Thus, the decision of when to regulate and under which statutes to regulate is left to the EPA's discretion." *United States v. Vineland Chem. Co.*, 692 F. Supp. 415, 420 (D.N.J. 1988).

Second, Defendants offer 42 U.S.C. § 9614(b): "Any person who receives compensation for removal costs . . . pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs . . . as provided in this chapter." Yet as Defendants themselves pled, the *Hudson* settlement called for Hudson to perform remedial actions at its own expense.[13] The Government is not receiving compensation for the same removal costs: it never received them in the first place.

---

[13] In the settlement of these claims . . . the United States covenanted not to sue the Hudson entities . . . in exchange for Hudson's performance, at its own cost, of the remediation at the Cushing Refinery . . . ." (Doc. 14, at 77).

Third, Defendants rely on 42 U.S.C. §§ 9613(f)(2)-(3), arguing that the Government's claims are barred because Defendants' already absolved their liability to the EPA by way of Hudson's settlement. Again, not the case. § 9613(f)(2) merely provides that a party who settles a CERCLA claim with the United States cannot then be held liable on a third party's contribution claim for the same conduct.[14] Hudson, the lone party who settled with the United States, is not even party to this lawsuit and faces no contribution claim. And while § 9613(f)(2) provides that a settlement does not discharge any other potentially liable persons under CERCLA, the provision does in fact reduce the potential liability of other persons by the amount of the settlement. But at any rate, there has been no CERCLA settlement.

As for § 9613(f)(3)(A), that allows the United States, in the event it "obtain[s] less than complete relief from a person who has resolved its liability to the United States," to then bring suit against someone who was not party to the settlement. That is exactly what the United States is doing. Similarly, § 9613(f)(3)(B) allows a person who has settled a CERCLA claim with the United States to seek contribution from a third party. Again, not relevant. No party here has settled a CERCLA claim.

The Court acknowledges that this case implicates equitable considerations. Because one of CERCLA's "primary purposes" is to "place the cost of . . . cleanup on those responsible for creating or maintaining the hazardous condition," Land O'Lakes should not

---

[14] "A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement." 42 U.S.C. § 9613(f)(2).

have to foot the bill for the cleanup of substances that were later released by Hudson. *HLP Properties, LLC v. Consol. Edison Co. of N.Y.*, 2015 WL 5092627, at *4 (S.D.N.Y. Aug. 28, 2015). After all, "response costs [must be allocated] among liable parties in an equitable manner." *Id.* Yet while the Court recognizes that equitable concerns abound in normally deciding how to apportion liability under CERCLA, the fact remains that none of these anti-duplication provisions precludes the Government's claims.

## THE GOVERNMENT'S MOTION TO DISMISS

The Government also asks the Court to strike Defendants' two counterclaims on the basis that both fail as a matter of law. The Court agrees: Defendants' first counterclaim, essentially an action for declaratory relief, is merely redundant of its affirmative defenses and will be moot upon judgment in this case. Similarly, Defendants' second counterclaim, brought under the citizen-suit provision of RCRA, is an inappropriate vehicle for challenging the Government's attempt to recover CERCLA costs. Both counterclaims are thus dismissed.

### Standard of Review on a Motion to Dismiss

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). "The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). There must be "sufficient factual matter, [which if] accepted as true . . . state[s] a claim to relief that is plausible on its face." *Iqbal*, 556 U.S.

at 678 (quoting *Twombly*, 550 U.S. at 570). A plausible claim is one that "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Put differently, "[Land O'Lakes'] counterclaim[s] must contain either direct or inferential allegations respecting all material elements to sustain a recovery *under some viable legal theory*." *DiGeronimo Aggregates, LLC v. Zemla*, 763 F.3d 506, 509 (6th Cir. 2014) (emphasis added). Thus, if the allegations "do not support a legal claim for relief," then "as a matter of law" they must be dismissed. *Baker v. Publishers Clearing House*, 413 F. App'x 85, 87 (10th Cir. 2011).

**Defendants' Declaratory Judgment Counterclaim**

In their first counterclaim, Defendants ask for declaratory relief. Specifically, they "seek a declaration of present and future legal obligations and rights of the parties under the bankruptcy Orders or this Court's Final Consent Decree and Closure Order with respect to the UAO and the present suit for cost recovery claims for the Government's emergency removal, non-time critical removal, RI/FS costs and other costs, if any, at the Site." (Doc. 14, at 79, ¶ 190). They also ask for a "declaration of present and future legal obligations and rights that the Government cannot re-litigate issues that were or could have been raised in the Bankruptcy or Lawsuit." (*Id.*).

The Court agrees with the Government that this claim is merely a reiteration of the Defendants' other defenses. As it noted in its earlier Order dismissing Land O'Lakes' separate suit for declaratory relief, Land O'Lakes is perfectly free to "pursue these claims as defenses to liability under CERCLA." *Land O'Lakes, Inc. v. United States*, No. CIV-15-683-R, 2016 WL 552966, at *3 (W.D. Okla. Feb. 10, 2016). Put simply, there is no need

for this counterclaim. If the Defendants prevail on any one of their remaining defenses, judgment will be in favor of Defendants. If the Government prevails, a declaration that the Consent Decree and res judicata do not bar the Government's CERCLA claims would serve no purpose. *See, e.g., Mille Lacs Band of Chippewa Indians v. State of Minn.*, 152 F.R.D. 580, 582 (D. Minn. 1993) (noting that the "proposed counterclaim is redundant and will be moot upon disposition of the plaintiffs' claims. A redundant declaratory judgment claim is not a proper declaratory judgment claim and should be dismissed."). What is more, the Court's decision to dismiss Defendants' declaratory-judgment counterclaim is only bolstered by the fact that courts have not been shy about dismissing these types of claims when there is a related civil suit pending whose resolution would make a decision on declaratory relief unnecessary. *See, e.g., AmSouth Bank v. Dale*, 386 F.3d 763, 790–91 (6th Cir. 2004) (declining to assume jurisdiction over declaratory judgment action because it would "would serve no useful purpose" where a different civil action filed in state court); *see also Int'l Harvester Co. v Deere & Co.*, 623 F.2d 1207, 1217–18 (7th Cir. 1980) (dismissing declaratory action where a different "pending suit may make resolution of the issues presented by this declaratory judgment suit unnecessary"). If dismissal is warranted where a related civil suit would make the declaratory action moot, surely dismissal is appropriate here where the resolution of the case itself will make Defendants' declaratory action unnecessary.

Defendants nonetheless insist that dismissal of a declaratory-judgment counterclaim is called for only where it presents identical legal and factual issues to the underlying claims

and here they are broader. How that is the case is not apparent. Judgment for either side in this case would seem to resolve the counterclaim.

**Defendants' Citizen-Suit Counterclaim**

Defendants second counterclaim stems from a misinterpretation of CERCLA: they allege that the Government, by bringing suit under CERCLA, is in violation of the RCRA's citizen-suit provision, 42 U.S.C.§ 6972(a)(1)(A). To be sure, RCRA has a citizen-suit provision that permits "any person [t]o commence a civil action on his own behalf against any person (including . . . the United States . . . to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or *order which has become effective pursuant to this chapter.*" *Id.* (emphasis added). By Defendants' position, because the Government's present suit violates the Consent Decree and Closure Order in the *Hudson* case, the RCRA grants them the right to sue the United States.

Even putting aside the question of whether the Government waived its sovereign immunity by filing suit against Land O'Lakes, Defendants' argument is off-base for two reasons. To begin with, the Court can find no authority supporting the idea that the Consent Decree or the Closure Order is an "order which has become effective pursuant to" RCRA. Of course, Defendants point out that "a consent decree is an order of the court."[15] But that misses the point; the court's order was not issued by way of RCRA. And finding otherwise—that somehow judicially approved consent decrees (i.e., settlements) resolving

---

[15] *United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 69 (2d. Cir. 1995).

RCRA claims—were orders issued *under* RCRA would not seem to square with the express authority conferred on the EPA to commence civil suits for violations of RCRA in situations where it has not yet obtained total relief. 42 U.S.C. § 6928(a). Nor would allowing Defendants to sue the Government for allegedly violating the Consent Decree—an agreement providing that *Hudson* would clean up the Refinery Site—seem to mesh with the purpose of § 6972: "permit[ting] private citizens to enforce [the RCRA's] provisions in some circumstances." In the end, because RCRA's citizen-suit provision, 42 U.S.C. § 6972(a)(1)(A), is not a proper vehicle to sue the Government for violating a Consent Decree, Defendants' counterclaims must be dismissed.

## CONCLUSION

In conclusion, Defendants' affirmative defenses are legally insufficient on their face. Neither the Bankruptcy proceedings nor the Government's earlier settlement with Hudson bars the Government's instant CERCLA action. As for their counterclaims, all fail as a matter of law as well: the declaratory judgment counterclaim is redundant; the citizen-suit provisions are inapt; and the anti-duplication provisions are not a vehicle to bring their cause of action. As for the Defendants' Motion to Strike, the Court finds that the Government's request to strike additional affirmative defenses was not procedurally improper.

Therefore, the Court DENIES Defendants' Motion to Strike. (Doc. 50). It also GRANTS Defendants' Motion to Dismiss Counterclaims and Strike Affirmative Defenses. (Doc. 34). Defendants' defenses three through ten are thus stricken and their two counterclaims, along with their anti-duplication-provision counterclaim, are dismissed.

IT IS SO ORDERED this 22nd day of February 2017.


DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE