## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

———————————————————————

| | |
|---|---|
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) 5:16-cv-00170-PRW | |
| LAND O'LAKES, INC., and ) | |
| CUSHING, OKLAHOMA ) JUDGE PATRICK R. WYRICK | |
| BROWNFIELDS, LLC ) | |
| ) | |
| Defendants. ) | |

———————————————————————

## PLAINTIFF UNITED STATES' OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

i

# Table of Contents

Table of Authorities ........................................................................................................ iv

INTRODUCTION .......................................................................................................... 1

CERCLA'S REMEDIAL PURPOSE .............................................................................. 1

UNITED STATES RESPONSE TO DEFENDANTS'
STATEMENT OF "UNDISPUTED" FACTS ................................................................. 2

UNITED STATES' LIST OF MATERIAL FACTS NOT IN DISPUTE ....................... 10

SUMMARY OF RELEVANT DATES WITH CITATIONS TO
DEFENDANTS' ADMISSIONS .................................................................................. 11

ARGUMENT ................................................................................................................. 12

I.   Summary Judgment Standard ................................................................................ 12

II.  The United States Cost Recovery Action is Timely ............................................... 12

    A.  CERCLA's Statute of Limitations .................................................................. 12

    B.  The United States' Action for Remedial Costs is Timely .............................. 14

        1.  The United States Incurred Remedial Costs at the Site ......................... 14

        2.  The United States Filed this Action within Six Years of Initiation of
            Physical On-site Construction of the Remedial Action ......................... 15

            a.  Land O'Lakes' 2009 Site Activities in Support of the Remedial
                Design Work Were Removal Activities, Not "Construction of
                the Remedial Action" ................................................................... 19

            b.  Land O'Lakes Submitted Sworn Statements to the EPA
                Environmental Appeals Board that Said the Remedial Action
                Started Much Later than December 2009 ...................................... 20

            c.  Land O'Lakes' Activities from August 2009 through February
                2010 Were Not "Construction of the Remedy" ............................. 22

C.  The United States Cost Recovery Action is Timely as to Removal Costs ...... 26

   1.  The "Consistency Waiver" Six-Year Statute of Limitations Does Not
      Apply to EPA's Removal Costs ........................................................... 26

   2.  If the Six-Year Statute of Limitations Applies at All in this Case,
      It Applies only to the NTCRA ............................................................. 30

CONCLUSION ..................................................................................................... 32

# Table of Authorities

**Cases**

*Agere Systems, Inc. v. Advance Envt'l Tech Corp.*,
602 F.3d 204 (3d Cir. 2010) ................................................................... 30, 31

*Atl. Richfield Co. v. Am. Airlines, Inc.*,
98 F.3d 564 (10th Cir. 1996) .................................................................... 4, 15

*Badaracco v. Commissioner*,
464 U.S. 386 (1984) .......................................................................................... 15

*Bogosian v. Gulf Oil Corp.*,
596 F. Supp. 62 (E.D. Pa. 1984) ................................................................ 23

*Bufferd v. Commissioner*,
506 U.S. 523 (1993) .......................................................................................... 31

*Burlington N. & Santa Fe Ry. v. United States*,
556 U.S. 599 (2009) ............................................................................................ 4

*Cal. Dept. of Toxic Substances v. Farley*,
2006 WL 2982152 (N.D. Cal. 2006) ........................................................ 19

*California v. Hyampom Lumber Co.*,
903 F. Supp. 1389 (E.D. Cal. 1995) ........................................................ 20

*California v. Neville Chemical Co.*,
358 F.3d 661 (9th Cir. 2004) ...................................................................... 19

*Chevron Mining Co. v. United States*,
863 F.3d 1261 (10th Cir. 2017) ............................................................... 4, 15

*City of Tulsa v. Tyson Foods, Inc.*,
258 F. Supp. 2d 1263 ....................................................................................... 15

*City of Wichita v. Trustees of APCO Oil Corp. Liquidating Trust*,
306 F. Supp. 2d 1040 (D. Kan. 2003) ................................................ passim

*Colorado v. Sunoco, Inc.*,
337 F.3d 1233 (10th Cir. 2003) .............................................. 15, 28, 29, 31

*Cooper Industries, Inc. v. Aviall Services, Inc.*,
543 U.S. 157 (2004) .......................................................................................... 31

*Doe v. Cutter Biological, Inc.*,
971 F.2d 375 (9th Cir. 1992) ...................................................................... 23

*Illinois v. Grigoleit Co.*,
104 F. Supp. 2d 967 (E.D. Ill. 2000) .................................................... 20, 22

*Kelley v. E.I. DuPont de Nemours & Co.*,
786 F.Supp. 1268 (E.D. Mich. 1992), *aff'd*, 17 F.3d 836 (6th Cir. 1994) .. 15, 18, 22, 30

*Louisiana v. Braselman Corp.*,
78 F. Supp. 2d 543 (E.D.La. 1999) ........................................... 19, 20, 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986) ................................................................................................ 24
*Metropolitan Life Ins. Co. v. Bradshaw*,
 450 F. Supp. 3d 1258 (W.D. Okla. 2020) ............................................................... 14
*New York v. Gen. Elec. Co.*,
 No. 14-747, 2017 WL 1239638 (N.D.N.Y. Mar. 31, 2017) ..................................... 19
*Pub. Serv. Co. of Colo. v. Gates Rubber Co.*,
 175 F.3d 1177 ..................................................................................................... 4, 16
*Reardon v. United States*,
 947 F.2d 1509 (1st Cir. 1991) .......................................................................... 16, 30
*Scott v. Harris*,
 550 U.S. 372 (2007) ................................................................................................ 24
*Shaefer v. Town of Victor*,
 475 F.3d 188 (2d Cir. 2006) ................................................................................... 25
*Sylvia v. Wisler*,
 875 F.3d 1307 (10th Cir. 2017) .............................................................................. 24
*United States v. Akzo Nobel Coatings, Inc.*,
 990 F. Supp. 897 (E.D. Mich. 1998) .......................................... 16, 18, 19, 20, 24, 26
*United States v. Atl. Richfield*,
 *(Arco)*, 147 F. Supp. 2d 614 (S.D. Tex. 2001) .......................................... 20, 22, 24, 26
*United States v. Bestfoods*,
 524 U.S. 51 (1998) .................................................................................................... 4
*United States v. Chromatex, Inc.*, 832 F. Supp. 900 (M.D. Pa. 1993),
 *aff'd*, 39 F.3d 1171 (3d Cir. 1994) .......................................................................... 32
*United States v. Findett Corp.*,
 220 F.3d 842 (8th Cir. 2000) ............................................................................ 15, 22
*United States v. Fleet Factors Corp.*,
 901 F.2d 1550 (11th Cir. 1990) ............................................................................... 16
*United States v. Navistar*, 152 F.3d 702 (7th Cir. 1998) .................................................. 25
*United States v. Petersen Sand & Gravel, Inc.*,
 824 F. Supp. 751 (N.D. Ill. 1991) ........................................................................... 16
*United States v. United Nuclear Corp.*,
 814 F. Supp. 1552 (D.N.M. 1992) .................................................................. 15, 16, 29

**Statutes**

42 U.S.C. § 9601(23) .................................................................................................... 22
42 U.S.C. § 9604(b)(1) .................................................................................................. 17
42 U.S.C. § 9606(a) ...................................................................................................... 33
42 U.S.C. § 9613(g)(2) ............................................................................................ 15, 28

**Other Authorities**

10A Fed. Prac. & Proc. Civ. § 2726.1 (4th ed.) ................................................................23

## INTRODUCTION

The issue before the Court is whether Defendants can evade liability for contamination at a Superfund site in Cushing, Oklahoma by: invoking a novel, unprecedented interpretation of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") statute of limitations, mischaracterizing response activities at the Site to their benefit, and contradicting sworn testimony that Defendant Land O'Lakes, Inc. ("LOL") submitted to the U.S. Environmental Protection Agency ("EPA") Environmental Appeals Board ("EAB") in August 2015. Defendants are wrong on the law and the facts, and their Motion for Summary Judgment should be denied.

## CERCLA'S REMEDIAL PURPOSE

CERCLA was designed "to promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination."[1] "The remedy that Congress felt it needed in CERCLA is sweeping: everyone who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup."[2] "[B]ecause CERCLA is remedial legislation, it should be construed liberally to carry out its purpose."[3] CERCLA was

---

[1] *Chevron Mining Co. v. United States*, , 863 F.3d 1261, 1269 (10th Cir. 2017) (quoting *Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 602 (2009)) (citation omitted).

[2] *Id.* (quoting *United States v. Bestfoods*, 524 U.S. 51, 56 n.1 (1998)) (citation omitted).

[3] *Atl. Richfield Co. v. Am. Airlines, Inc.*, 98 F.3d 564, 570 (10th Cir. 1996).

enacted to "shift the cost of environmental response from the taxpayers to the parties who benefitted from the wastes that caused the harm."[4]

## UNITED STATES' RESPONSE TO
## DEFENDANTS' STATEMENT OF "UNDISPUTED" FACTS

1.     Disputed in part. The Emergency Removal Action work was completed on September 4, 1999.[5]  The final ERA report, "Removal Support Report for Hudson Refinery, Cushing, Payne County, Oklahoma," is dated July 10, 2000.[6] EPA's special notice letter was dated January 18, 2001.[7]

2.     Undisputed.

3.     Undisputed.

4.     Disputed in part. EPA's Record of Decision ("ROD") set forth the *Remedial Design* and Remedial Action to be implemented at the Site.[8]

---

[4] *Pub. Serv. Co. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177, 1181(10th Cir. 1999); *See also City of Wichita v. Trustees of APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1098 n.52 (D. Kan. 2003)

[5] *See* Ex. 2 to the Declaration of Scott M. Cernich (Removal Support Report for Hudson Refinery, July 10, 2000) at USEPA0001103. All exhibits cited herein are attached to the accompanying declaration of Scott M. Cernich in Support of the United States' Opposition to Defendants' Motion for Summary Judgment.

[6] *See id.* at USEPA0001092.

[7] *See* Def. Mot., Ex. 63.

[8] *See* Def. Mot., Ex. 4 (Record of Decision) at pp. 68-70, 72-73 (ECF 128-8 at pp. 77-79, 81-82).

5.      Undisputed but incomplete. The United States' CERCLA Section 107(a) cost recovery action sought to recover all past, present, and future response costs incurred, or to be incurred in connection with the Site.[9]

6.      Undisputed.

7.      The United States incorporates and restates its responses set forth in paragraphs 1 through 6, *supra*.

8.      Undisputed.

9.      Incomplete. Following the ROD and prior to issuance of the UAO, EPA issued a special notice letter to Land O'Lakes dated February 19, 2008 requesting that Land O'Lakes perform the remedial design/remedial action ("RD/RA") at the Site consistent with the ROD.[10] Land O'Lakes refused.[11]

10.     Undisputed.

11.     Undisputed.

12.     Disputed in part. UAO paragraph 99 states, "the Respondent will obtain, or use its best efforts to obtain Site access agreements from the present owners within thirty (30) days of the effective date of this Order."[12] The UAO did not require Land O'Lakes to purchase Site property or to form a real estate holding company.[13] Land O'Lakes did

---

[9] *See* Complaint (Dkt. 1).

[10] *See* Ex. 3 (LOL 106(b) Petition) at LOLCR00000056-57.

[11] *See id*.

[12] *See* Def. Mot., Ex. 5 (UAO) at ¶ 99 (ECF 128-9 at pp. 27-28).

[13] *See id*., *generally*.

3

not obtain access to the Site within 30 days of the effective date of the UAO as required

by the UAO.[14] EPA initiated Site access efforts in order to timely commence RD/RA

work required under the UAO.[15]

      13.     Dispute in part. EPA informed Land O'Lakes that it *did not disapprove* (in

contrast to *approved*) of Land O'Lakes RD/RA contractors.[16]

      14.     Disputed. Land O'Lakes *committed* to a construction completion date of

September 1, 2010 in two separate meetings with EPA (Dec. 5, 2008 and Jan. 16,

2009).[17] Land O'Lakes' Remedial Action Report says "EPA and LOL agreed in [sic]

December 5, 2008 to attempt an accelerated schedule for the RD/RA with the goal of

completion by September 15, 2010.[18]

      15.     Undisputed as to quotes from documents. Disputed as to Defendants'

characterization of Ms. Stankosky's memorandum and email. The remedial action work

did not start in mid-November.[19]

      16.     Disputed in part. The United States does not dispute the information in

Defendants' table of dates, however Defendants do not define the terms "segmented" and

"phased," so the United States lacks information to dispute or not dispute that

characterization.

---

[14] *See* Ex. 1 (Stankosky Decl.) at ¶ 14.

[15] *See id*.

[16] *See id*.

[17] *See id*.

[18] See Ex. 9 (Remedial Action Report) p. 17 at USEPA0803719.

[19] *See* Ex. 1 (Stankosky Decl.) at ¶ 14.

17.     Disputed as to relevance and materiality. Defendants correctly quote the cited guidance, however the language quoted refers to "Federal facilities" and is "[f]or the purpose of a five-year review," not for purpose of establishing limitation periods.[20] The Site is not a "Federal facility" and we are not litigating a "five-year review."

18.     Dispute characterization of activities. Mobilization to the Site in August 2009 by Land O'Lakes contractors was in support of remedial *design* activities. Land O'Lakes did not have an approved Remedial Design Work Plan until September 2009.[21] The September 4, 2009 Remedial Design Work Plan states: "*Prior to beginning [Remedial Action] RA activities*, the following types of site preparation activities will take place: grubbing, mowing, surveying and flagging and/or staking the boundaries, and as necessary, the interior sampling grids, for the following: SAOC's, visible waste, ACM, and coke tar areas. In addition, scrap metal to be removed will be marked. Fence line air monitoring may be established for background conditions, material and equipment staging areas will be marked, and as necessary, roads will be established for routing trucks through the Site."[22] Additionally, the August 21, 2009 Remedial Design Site Management Plan described how the Site was to be managed to control access, provide facilities to workers and visitors to the site, and provide security during remedial design activities. This included fencing, mowing, office facilities and utilities, supplemental field

---

[20] *See* Def. Mot., Ex. 32 at p. 1-5 (ECF 128-36 at p. 4).

[21] Ex. 4 (RD Work Plan) at USEPA0067513.

[22] *Id*. at USEPA0067522.

investigation. As noted in remedial design documents, the Site was fenced, but fence repairs were needed for access control.[23]

19.     Undisputed.

20.     Undisputed.

21.     Disputed. Defendants' do not define the term "maintenance." Site activities in September, October, and November were in support of the remedial design.[24]

22.     Disputed. Site fencing work during December 2009 was performed in accordance with the Remedial Design Site Management Plan.[25] Road construction did not begin until the week ending March 7, 2010 as evidenced by Land O'Lakes weekly activity reports submitted to EPA.[26]

23.     Undisputed as to date and timeframe of trailer placement and utility installation, but trailer placement was in accordance with Remedial Design Site Management Plan.[27]

24.     Undisputed as to timeframe of clearing and grubbing activities. Those activities were also taken in accordance with the Remedial *Design* Work Plan.[28] Clearing

---

[23] *See* Ex. 5 (RD Site Management Plan) at USEPA0067500-01,

[24] *See* Ex. 1 (Stankosky Decl.) at ¶¶ 15-17.

[25] *See* Ex. 5 at USEPA0067500; Ex. 1 (Stankosky Decl.) at ¶ 15.

[26] *See* Ex. 6 (Weekly Status Updates (Attach. 3 to the Remedial Action Report) at USEPA0805114-126.

[27] *See* Ex. 5 at USEPA0067500; Ex. 1(Stankosky Decl.) at ¶ 15.

[28] *See* Ex. 4 (RD Work Plan) at USEPA0067522 (grubbing will take place *prior to beginning RA activities*), ; Ex. 1 (Stankosky Decl.) at ¶¶ 15-19.

and grubbing were necessary to perform Remedial Design sampling activities.[29] Heavy equipment was onsite in October 2009 for Remedial Design pothole sampling and heavy equipment was used for clearing and grubbing that facilitated Remedial Design sampling.[30]

25.     Disputed that activities described by Defendant "remedial action construction activities." Land O'Lakes' contractor Envirocon's weekly status reports for the weeks ending January 24 and 31, 2010 make no mention of delivery of construction materials or improving and creating haul roads.[31] No activities occurred at the Site during the month of February 2010 due to hazardous weather and wet/muddy site conditions. Envirocon weekly status updates for all weeks in February 2010 indicate, "No work wet/muddy conditions; site unworkable; equipment idle."[32]

26.     Disputed. Land O'Lakes' contractor Envirocon's weekly status reports for the weeks ending January 24 and 31, 2010 make no mention of collecting, excavating, or stockpiling surface metal and piping.[33] The Weekly Status Update for the week ending March 7, 2010 is the first reference to scrap metal and pipe removal and stockpiling.[34]

_____

[29] *See id.*

[30] *See id.*

[31] *See* Ex. 6 (Weekly Status Updates (Attach. 3 to the Remedial Action Report) at USEPA0805114-116.

[32] *See id.* at USEPA0805117-124; *See also* Ex. 1 (Stankosky Decl.) at ¶ 18.

[33] *See* Ex. 6 (Weekly Status Updates (Attach. 3 to the Remedial Action Report) at USEPA0805114-116.

[34] *See id.* at 0805114-125.

Scrap metal removal is specifically addressed in, and contemplated as part of, the Remedial Design Site Management Plan.[35]

27.     Disputed in part. Some of these activities were conducted pursuant to the Remedial Design Work Plan and Remedial Design Site Management Plan. The Envirocon Weekly Status Update for the week of January 24, 2010 identifies clearing and grubbing, erosion control measures, remedial design-related scrap and tank metal surveys and marking.[36]

28.     Disputed. Decontamination or track pads also were elements of the Remedial Design Site Management Plan.[37]

29.     Disputed. Envirocon's Weekly Status Report for the week ending January 24, 2010 describes the "installation" of a silt fence and hay bales, not "construction."[38]

30.     Disputed. EPA conducted oversight of the Land O'Lakes contractors work, and EPA-funded contractors collected split confirmatory samples and provided oversight of Land O'Lakes contractor work.[39]

31.     Disputed. EPA has incurred unreimbursed remedial oversight costs and enforcement costs and will continue to incur such costs for the Site.[40] One example of

---

[35] See Ex. 4 (RD Work Plan) at USEPA0067526-27, USEPA0067545-46, USEPA0067550.

[36] *See id*. at 0805114; *see also* Exs. 3, 4; *see also* Ex. 1 (Stankosky Decl.) at ¶¶ 17-19.

[37] *See* Ex. 5 (RD Site Management Plant) at USEPA0067501.

[38] *See* Ex. 6 (Weekly Status Updates (Attach. 3 to the Remedial Action Report)) at USEPA0805114.

[39] See Ex. 1 (Stankosky Decl.) at ¶ 23.

[40] *See* Ex. 1 (Stankosky Decl.) at ¶¶ 25-26.

these oversight costs relates to groundwater monitoring. Land O'Lakes is required to continue conducting groundwater sampling under the UAO and EPA continues to incur oversight costs in review reports and deliverables from Land O'Lakes.[41]

32.     Disputed. EPA did in fact reply to Mr. Starns November 20, 2018 letter by letter dated April 17, 2019.[42] The United States, on behalf of EPA, sued Land O'Lakes for its response costs, including unreimbursed oversight costs on February 22, 2016.[43]

---

[41] *See* Def. Mot., Ex. 6 (UAO) at ¶¶ 72-73, 76, 84-86 (ECF 128-9 at pp. 21-25).

[42] *See* Ex. 1 (Stankosky Decl.) at ¶ 25.

[43] *See* Complaint (Dkt. 1).

## UNITED STATES' LIST OF MATERIAL FACTS NOT IN DISPUTE

1.      On March 22, 1999, EPA sent Land O'Lakes a CERCLA Section 104 information request letter requesting that it conduct of a detailed investigation of its former activities at the Site via its predecessor Midland Cooperatives, Inc. ("Midland").[44]

2.      By letter dated August 3, 2000, EPA offered Land O'Lakes the opportunity to perform the Non-Time Critical Removal Action (NTCRA) at the Site.[45] Land O'Lakes declined.[46]

3.      EPA sent Land O' Lakes a special notice letter dated January 18, 2001 requesting Land O'Lakes' assistance in performing the Remedial Investigation/Feasibility Study ("RI/FS").[47] Land O'Lakes declined.[48]

4.      Defendant Land O'Lakes submitted a CERCLA Section 106(b) Petition ("LOL 106(b) Petition") to the EPA Environmental Appeals Board ("EAB") on or about August 15, 2015.[49] Included as exhibits to that petitions were the sworn affidavits of

---

[44] *See* Dkt. 126-1.

[45] *See* Dkt. 129-2.

[46] *See* Dkt. 62 at pp.4-6.

[47] *See* Def. Mot., Ex. 63 (ECF 128-67).

[48] *See* Dkt. 62 at pp. 4-6.

[49] *See* Ex. 3 (LOL 106(b) Petition w/o exhibits).

Land O'Lakes' contractors David Brady (Site Superintendent) and Eldon Penn (Project

Manager).[50]

5.      Land O'Lakes has not amended the LOL 106(b) Petition and Messrs. Brady

and Penn have not supplemented or amended their respective sworn affidavits.

6.      February 22, 2016 is less than six years after April 19, 2010.

## SUMMARY OF RELEVANT DATES
## WITH CITATIONS TO DEFENDANTS' ADMISSIONS

| Date | Event | Citation to Defendants' admissions |
|---|---|---|
| November 23, 2007 | EPA issues ROD for the Site selecting the remedial action. | Def. Mot. at ECF 12, ⁋ 4. |
| February 22, 2010 | Six years prior to date complaint was filed. | Def. Mot. at ECF 14, ⁋ 15 and ECF Dkt. 1, minus 6 years |
| Late February[51] | Remedial Action "general site activities, including clearing/grubbing and grading, road improvements, consolidation of metal and debris, began at the Site" | Witness affidavit (Mr. Brady, Site Superintendent) submitted to EPA by Land O'Lakes at ¶ 125.[52] |
| March 29, 2010 | Land O'Lakes submitted the Pre-Final Remedial Design to EPA. | Witness affidavit (Mr. Brady) submitted to EPA by Land O'Lakes ¶ 125. |
| April 19, 2010 | EPA approved the Remedial Design. | LOL 106(b) Petition submitted to EPA, p. 55.[53] |
| April 2010 | Envirocon's Remedial Action "construction work" for the Site begins | Witness affidavit (Mr. Penn, Project Manager) submitted |

---

[50] *See id.* at LOLCR00000020.

[51] In fact, there were no activities at the Site during the month of February 2010 due to hazardous weather and wet/muddy site conditions. *See* Ex. 6 (Weekly Status Updates (Attach. 3 to the Remedial Action Report)) at USEPA0805117-124. Site activities restarted the first week of March 2010. *See id.* at USEPA0805125.

[52] *See* Ex. 7 (Brady 106(b) Affid.) ¶ 125 at USEPA00033062.

[53] *See* Ex. 3 (LOL 106(b) Petition) at LOLCR00000069.

| | | to EPA by Land O'Lakes at ¶ 14.D.[54] |
|---|---|---|
| June 1, 2010 | Date of "mobilization for sediment, soil, and other media remediation activities" | Witness affidavit (Mr. Brady) submitted to EPA by Land O'Lakes at ¶ 132.[55] |
| Feb. 22, 2016 | Complaint filed | Def. Mot. at ECF 14, ¶ 15; Dkt. 1. |

## **ARGUMENT**

### I.     **Summary Judgment Standard**

This Court is well familiar with the summary judgment standard.[56] In the interest of brevity, we do not repeat it here.

### II.    **The United States Cost Recovery Action is Timely**

The United States incurred remedial costs, and brought this action within six years of "initiation of physical on-site construction of the remedial action," at the Site. The United States incurred removal costs, and the remedial action was initiated within three years of completion of the removal action, at the Site. Thus, the United States' CERCLA cost recovery action is timely.

### A.    **CERCLA's Statute of Limitations**

Under CERCLA, separate limitations periods apply to "removal" and "remedial" actions. Namely, Section 113(g)(2) provides in relevant part:

An initial action for recovery of the costs referred to in section 9607 of this title must be commenced—

---

[54] *See* Ex. 8 (Penn 106(b) Affid.) ¶ 14.D at LOL00018032.

[55] See Ex. 7 (Brady 106(b) Affid.) ¶ 132 atLOLCR00033064.

[56] *See, e.g., Metro. Life Ins. Co. v. Bradshaw*, 450 F. Supp. 3d 1258, 1260-61 (W.D. Okla. 2020).

(A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and

(B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

CERCLA, 42 U.S.C. § 9613(g)(2). In applying these limitations periods, a court must determine what constitutes a "removal" or "remedial" action.[57]

Any analysis of Section 113(g)(2) begins with the well-settled proposition that statutes of limitations should be construed in favor of the government so as not to cut off important public rights.[58] This principle is particularly true in cases under CERCLA, a remedial statute, which should be liberally interpreted to avoid frustrating its remedial purposes.[59] Many courts have held CERCLA's statute of limitations should be interpreted in favor of the United States.[60] Accordingly, the Court should resolve any ambiguity in

---

[57] *See Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1241-42 (10th Cir. 2003).

[58] *See Badaracco v. Comm'r*, 464 U.S. 386, 391 (1984). *See also United States v. Findett Corp.*, 220 F.3d 842, 848 (8th Cir. 2000) (quoting *Badaracco* in interpreting CERCLA statute of limitations).

[59] *See, e.g, Chevron Mining*, 863 F.3d at 1269 (quoting *Atl. Ritchfield Co. v. Am. Airlines, Inc.*, 98 F.3d 564, 570 (10th Cir. 1996) ("[b]ecause CERCLA is remedial legislation, it should be construed liberally to carry out its purpose."); *City of Tulsa v. Tyson Foods, Inc.*, 258 F. Supp. 2d 1263, 1285 (N.D. Okla. 2003) ("CERCLA is a remedial statute that courts construe liberally to effectuate its broad response and reimbursement goals"); *United States v. United Nuclear Corp.*, 814 F. Supp. 1552, 1561-63 (D.N.M. 1992) (statutes of limitations are to be construed liberally in favor of the government (citation omitted) and the broad remunerative policies behind CERCLA).

[60] *See, e.g., Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 842 (6th Cir. 1994) (holding CERCLA's statute of limitations ambiguous and therefore resorting to rule of

Section 113(g)(2) in favor of the government's right to bring an action to recovery

taxpayer funds and hold responsible persons liable for cleanup costs.[61]

### B.     The United States' Action for Remedial Costs is Timely

#### 1.     The United States Incurred Remedial Costs at the Site

Land O'Lakes is simply wrong when it says that the United States did not incur

any remedial costs at the Site. *See* Defs.' Argument III.A. The United States has incurred

$1,386,907.65 in unreimbursed remedial costs for the Site.[62] It is true that Defendants

funded the remedial action, but EPA also incurred remedial costs in overseeing and

---

statutory construction favoring government); *Reardon v. United States*, 947 F.2d 1509, 1513 (1st Cir. 1991) (en banc) (allowing broad interpretation of statute of limitations so as not to bar government's CERCLA claim); *United States v. Akzo Nobel Coatings, Inc.*, 990 F. Supp. 897, 907 (E.D. Mich. 1998) (construing statute of limitations' trigger, initiation of physical on-site activity, narrowly in favor of government); *United States v. Petersen Sand & Gravel, Inc.*, 824 F. Supp. 751, 755 (N.D. Ill. 1991) (stating, "[statute of limitations] must be afforded a broad and liberal construction so as to avoid limiting the liability of those responsible for cleanup costs beyond the limits expressly provided")*; United Nuclear*, 814 F. Supp. at 1561-62 ("[t]he running of the statute of limitations is entirely within the EPA's control ... [t]he Government may take its own sweet time before suing, and ... the removal or remedial action may itself take years to complete" (quoting *Reardon*, 947 F.2d at 1519.

[61] *Accord Pub. Serv. Co. of Colo.*, 175 F.3d at 1181 (CERCLA was enacted to "shift the cost of environmental response from the taxpayers to the parties who benefitted from the wastes that caused the harm"); *City of Wichita*, 306 F. Supp. 2d at 1098 n.52 (holding that defendant's interpretation would turn CERCLA on its head and undermine the very purpose of the act and that CERCLA was enacted "to shift the cost of environmental response from the taxpayers to the parties who benefitted from the wastes that caused the harm" (citation omitted)); *United States v. Fleet Factors Corp.,* 901 F.2d 1550, 1557 (11th Cir. 1990) ("In order to achieve the 'overwhelmingly remedial' goal of the CERCLA statutory scheme, ambiguous statutory terms should be construed to favor liability for the costs incurred by the government in responding to the hazards at such facilities").

[62] *See* Stankosky Decl. at ¶ 26 (EPA Cost Summaries).

approving that work. Moreover, Defendants' position would allow any responsible party to escape liability for a removal action entirely by merely complying with an order to conduct the remedy. Or, a defendant could pay EPA's remedial oversight bills for exactly six years, then stop paying and walk away with no further obligations, even for a remedy that might go on for 25 more years (*e.g.*, ground water pumping).

> ### 2.     The United States Filed this Action within Six Years of Initiation of Physical On-site Construction of the Remedial Action

The remedial action components here, as set out in the Record of Decision, were digging and hauling contaminated soil and sediments for off-site disposal, draining surface water from the wastewater ponds, and monitoring groundwater.[63]

The remedial action did not commence, and the removal action did not end, until after EPA approved the Final Remedial Design on April 19, 2010. The title of the UAO EPA issued to Land O'Lakes was "Unilateral Administrative Order for *Remedial Design and Remedial Action*."[64] (emphasis added). Remedial design is a removal activity because it falls within CERCLA § 104(b)(1), 42 U.S.C. § 9604(b)(1), which covers investigative activity including engineering and other studies needed to direct response actions. The clear language of the statute for the start of the remedial action, "initiation of physical on-site construction of the remedial action," highlights the difference from

---

[63] *See* Def. Mot., Ex. 4 (EPA Record of Decision) at pp. 1-2 (ECF 128-8 at pp. 10-11).

[64] *See* Def. Mot., Ex. 5 (UAO) at ¶ 1 (ECF 128-9 at p. 5).

remedial design. A remediation *action* cannot be performed without a remedial *design*. Construction of the remedial action cannot begin until "after design of the remedy."[65]

The *Akzo Nobel* case is instructive. In that case the court found that the term "removal" includes "site investigation and study, of which remedial design is an important part"[66] – investigation and study just like the remedial *design* activities Land O'Lakes undertook at the Site. In its CERCLA Section 106(b) Petition, Land O'Lakes told the EAB that it conducted *Remedial Design* field work beginning in September 2009 which continued until May 2010.

> In September/October 2009, Land O'Lakes conducted RD [Remedial Design] activities at the Site with the installation of approximately 70 soil borings and the collection of approximately 210 samples to further delineate the areas within the SAOCs [Soil Areas of Concern] that contained COCs [Contaminants of Concern] exceeding the ROD cleanup levels. EPA required Land O'Lakes to conduct a second investigation of the SAOCs, referred to as Hot Spot sampling. In May 2010, Land O'Lakes conducted the Hot Spot sampling with the installation of 62 additional soil borings and the collection of 186 additional soil samples.[67]

The UAO defined "Remedial Design" or "RD" as "those activities to be undertaken by Respondent to *develop the final plans and specifications for the Remedial Action*

---

[65] *United States v. Akzo Nobel Coatings, Inc.*, 990 F. Supp. 2d 897, 905-907 (E.D. Mich. 1998) (quoting the House Judiciary Committee Report to the Superfund Amendments and Reauthorization Act of 1986 (SARA), which included 42 U.S.C. § 9613(g)(2)) ("The report stated that remedial action begins 'after the RI/FS and *after design of the remedy*.'" (emphasis in original) (quoting H. Rep. No. 99-253, Pt. 3 99th Cong., 1st Sess.21 (1985)).

[66] *Id.* at 907. *See also Kelley*, 786 F. Supp. 1268 (E.D. Mich. 1992), *aff'd* 17 F.3d 836, 840 (6th Cir. 1994).

[67] Ex. 3 (LOL 106(b) Petition) p. 54 at LOLCR00000068.

16

pursuant to the 'Remedial Design Workplan.'" (emphasis added).[68] The UAO and the ROD clearly contemplated that substantial investigatory work had to be done before implementation of a long-term remedy.[69] Accordingly, by the terms of the UAO and the ROD, the remedial action could not commence without a remedial design.

Land O'Lakes Site Superintendent David Brady recognized that the remedial design parameters were a prerequisite to the remedial action. In a sworn statement, he told the EPA EAB:

> Land O'Lakes submitted the Pre-Final Remedial Design to EPA on March 29, 2010. This document provided the findings of the RD activities and provided the design parameters for the Remedial Action."[70]

Thus, because the removal action for the Site did not end until final approval of the remedial design on April 19, 2010, *initiation* of "physical on-site construction of the remedial action" could not have occurred before that date.[71] April 19, 2010 is less than six years prior to the date of this action – February 22, 2016.

---

[68] Def. Mot., Ex.5 (UAO) at ¶ 51.k (ECF 128-9, p. 17).

[69] *See Akzo Nobel*, 990 F. Supp. 2d at 905-906 (finding that remedial action could not begin when there was investigatory work left to do); *Louisiana v. Braselman*, 78 F. Supp. 2d 543, 549 (E.D. La. 1999) (remedial design investigations, including a pilot study, were part of removal action and not "construction" of the remedial action); *New York v. Gen. Elec. Co.*, No. 14-747, 2017 WL 1239638, at *15 (N.D.N.Y. Mar. 31, 2017) (remedial statute of limitations is not be triggered when an activity is defined as part of a removal).

[70] Ex. 7 (Brady 106(b) Affidavit) ¶ 125 at LOLCR00033062.

[71] *See Akzo Nobel,* 990 F. Supp. at 907*; California v. Neville Chem. Co.*, 358 F.3d 661 (9th Cir. 2004) (final adoption of remedial action plan is required before limitations period starts to accrue on an initial suit for recovery of remedial action costs); *Cal. Dept. of Toxic Substances v. Farley*, No. C 05-3150 PJH, 2006 WL 2982152, at *4-6 (N.D. Cal. Oct. 17, 2006) (approval of the site's remedial action plan was prerequisite to initiation of remedial action).

If the Court concludes, however, that the remedial action *could* have started prior to approval of the remedial design on April 19, 2010, the United States action for remedial costs is still timely. Land O'Lakes' activities at the Site prior to February 22, 2010 do not meet the definition of "initiation of physical on-site construction of the remedial action." To determine when "physical on-site construction of the remedial action" takes place, some courts have employed a four-part test first set out in *California v. Hyampom Lumber*.

> The activity must be "physical," in that it cannot consist of planning, meeting or merely observing the site. Second, the activity must be "on-site," as opposed to construction that takes place in a factory or other site. Third, the actions must be part of the "construction of the remedial action." Finally, the activity must be the "initiation" of the remedial action.[72]

In *Akzo Nobel*, however, the court found that nothing in *Hyampom Lumber* prohibits additional considerations, and added an additional requirement – "that the action play a critical role in implementation of the permanent remedy."[73] The *Hyampom Lumber* court stressed that:

> [T]he term ["construction"] [as used in CERCLA's statute of limitation] ... serves the purpose of excluding those preliminary and tentative "physical on-site" activities that while related to the remedial action, are not part of its construction.[74]

---

[72] *See United States v. Atl. Richfield (Arco)*, 147 F. Supp. 2d 614, 620 (S.D. Tex. 2001) (citing *California v. Hyampom Lumber Co.*, 903 F. Supp. 1389, 1391-92 (E.D. Cal. 1995)).

[73] *Akzo Nobel*, 990 F. Supp. 2d at 904-905.

[74] *Id.* at 906 (quoting *Hyampom Lumber*, 903 F. Supp. at 1392). *See also Illinois v. Grigoleit Co.*, 104 F. Supp. 2d 967, 975 (E.D. Ill. 2000); *Braselman*, 78 F. Supp. 2d at 549.

Land O'Lakes pre-remedial design activities at the Site do not meet satisfy these factors.

> ### a.   Land O'Lakes' 2009 Site Activities in Support of the Remedial Design Work Were Removal Activities, Not "Construction of the Remedial Action"

In August 2015 Land O'Lakes told the EPA EAB that "[m]obilization for the RA [Remedial Action] activities started on December 7, 2009,"[75] but now contends in this Court that onsite physical construction of the remedial action began in August 2009. As previously discussed above in section II.B.2. Land O'Lakes told the EAB that it conducted *Remedial Design* field work beginning in September 2009 which continued until May 2010.[76] Land O'Lakes' Site Superintendent told the EAB in a sworn affidavit:

> Once EPA approved the complete [Remedial Action] RA Work Plan, mobilization for sediment, soil, and other media *remediation activities began on June 1, 2010*. (emphasis added).[77]

It is disingenuous at best for Defendants to now tell this Court a different story, *i.e.*, that "on-site physical, remedial action construction occurred in August, 2009 and continued thereafter."[78] As noted above, the UAO required a remedial design *before* a remedial action. Land O'Lakes' on-site work beginning in August 2009 (including installation of work trailers, gravel pads, roadways, and utilities, and installation and repair of fencing) were in support of remedial design activities, primarily taking soil borings and soil samples necessary to delineate contamination that would later be addressed in the

---

[75] Ex. 3 (LOL 106(b) Petition) p. 54 at LOLCR00000068.

[76] *Id*.

[77] Ex. 7, (Brady 106(b) Affid.) ¶ 132 at LOLCR00033064.

[78] *See* Def. Mot. at p. 27.

remedial action.[79] Actions taken to "monitor, assess and evaluate the release or threat of release of hazardous substances" are considered removal actions under CERCLA.[80] Sampling, investigation, and delineation are by definition "removal" in nature and, while they may be consistent with the later-approved permanent remedy, cannot be characterized as "construction of the remedy."

> **b.    Land O'Lakes Submitted Sworn Statements to the EPA Environmental Appeals Board that Said the Remedial Action Started Much Later than December 2009.**

As discussed above, the remedial design was not complete in December 2009 and Land O'Lakes was still in the process of taking soil samples and borings, and delineating contamination.[81] Land O'Lakes also told a different story to the EPA EAB about clearing and grubbing, fencing, erosion controls, and roadwork that occurred in December 2009 and later. In support of its CERCLA 106(b) Petition, Land O'Lakes submitted Site Superintendent David Brady's affidavit, which said:

---

[79] *See* Def. Mot. at pp. 26-28; Ex. 3 (LOL 106(b) Petition) pp. 54-55 at LOLCR00000068-69.

[80] 42 U.S.C. § 9601(23) (definition of "removal"). *See Arco*, 147 F. Supp.2d at 621; *Findett*, 220 F.3d at 848 (site visits, soil and water sampling, engineering surveys, and determination of size and location of support pad cannot be characterized as physical on-site construction); *Kelley*, 17 F.3d at 840 (investigation and study of cleanups is a "removal" action); *Illinois v. Grigoleit Co.*, 104 F. Supp. 2d 967, 976 (C.D. Ill. 2000) (inspection and sampling are not sufficient to establish "physical initiation of construction of the remedial action").

[81] *See* Ex. 3 (LOL 106(b) Petition) p. 54 at LOLCR00000068.

> **Remedial action general site activities, including clearing/grubbing and grading, road improvements, consolidation of metal and debris, began at the Site in late February.**[82]

> Once EPA approved the complete [Remedial Action] RA Work Plan, mobilization for sediment, soil, and other media remediation activities began on June 1, 2010.[83]

In addition, the Project Manager for Land O'Lakes' remediation contractor Envirocon told the EPA EAB in a sworn affidavit that "Envirocon's RA [Remedial Action] construction work for the [Site] Project … occurred during the period April 2010 through January 2011.[84]

Now, because it serves Defendants' interests to try to avoid liability for the contamination at the Site resulting from Land O'Lakes' (as Midland) operations, Defendants offer this Court a different story. The Court should not credit Defendants' new characterization of Land O'Lakes activities at the Site. If nothing else, the Defendants' conflicting testimony establish a genuine issue of material fact,[85] and if there is a genuine dispute as to some material fact, the Court must consider the evidence and all

---

[82] Ex. 7 (Brady 106(b) Affid.) ¶ 130 at LOLCR00033063.

[83] Ex. 7 (Brady 106(b) Affid.) ¶ 132 at LOLCR00033064.

[84] Ex. 8, (Eldon 106(b) Affid.) ¶ 14.D at LOLCR00018032.

[85] *See Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 380-81 (9th Cir. 1992) (contradictions in dates provided by a party created a legitimate issue of material fact making grant of summary judgment inappropriate); *Bogosian v. Gulf Oil Corp*., 596 F. Supp. 62, 69–70 (E.D. Pa. 1984) (summary judgment inappropriate where conflicting testimony from the same witnesses creates a factual issue for resolution). *See also* 10A Fed. Prac. & Proc. Civ. § 2726.1 (4th ed.) ("As a general rule, if conflicting testimony appears in the affidavits and depositions that are filed, summary judgment may be inappropriate as the issues involved will depend on the credibility of the witnesses.").

reasonable inferences from the evidence in the light most favorable to United States as the nonmoving party.[86]

  **c.**  **Land O'Lakes' Activities from August 2009 through February 2010 Were Not "Construction of the Remedy"**

  Even if the Court accepts Land O'Lakes current narrative contradicting its submission to the EPA EAB, Land O'Lakes' activities at the Site from August 2009 through February 2010 (to the extent they are not properly classified as "removal" activities) were not "construction of the remedy" because they were preliminary preconstruction steps that did not play a critical role in implementation of the permanent remedy.[87] The components of the remedy here were: digging and hauling contaminated soil and sediments, drainage of surface water from the wastewater ponds, and groundwater monitoring.[88] The first action that could be considered actual implementation of the permanent remedy did not occur until April 27, 2010, the date on which Land O'Lakes began dewatering the wastewater ponds.[89] Shovel did not go to dirt at the Site for removing contaminated soils and sediments until the week ending June 6, 2010.[90]

---

[86] *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Sylvia v. Wisler*, 875 F.3d 1307, 1328 (10th Cir. 2017).

[87] *See Arco*, 147 F. Supp. 2d at 620; *accord Akzo Nobel*, 990 F. Supp. at 907; *Braselman*, 75 F. Supp. 2d at 549.

[88] *See* Def. Mot., Ex. 4 (ROD) at pp. 1-2 (ECF 128-8, pp. 10-11).

[89] *See* Ex. 9, (Remedial Action Report) p. 19 at USEPA0803721.

[90] *See* Ex. 6 (Weekly Status Updates (Attach. 3 to the Remedial Action Report)) at USEPA 0805153-155.

Defendants may point to *U.S. v. Navistar* to support their claim that physical on-site construction of the remedy began as early as August 2009, however the facts in *Navistar* are easily distinguishable from this case.[91] In *Navistar*, the chosen remedy was to place a clay cap on a landfill and the court held that placing a "lift" of clay on-site for construction of a clay cap triggered the CERCLA remedial limitations period.[92] None of the activities at issue here – installing fencing and erosion control features, clearing and grubbing, installing trailers, marking scrap metal and pipe, preparing track pads, etc. – are analogous to that lift of clay. Likewise, Land O'Lakes' reliance on *Schaefer v. Town of Victor* is misplaced.[93] In that case, the remedial action included closing a landfill by placing cover on it, and the court found that use of a crane to actually dig, drag, and spread the cover was construction of the remedy.[94] Citing the CERCLA's definition of "remedial action," the *Schaefer* court noted that CERCLA specifically contemplates that the use of cover is a "remedial action" for purposes of the statute.[95] Again, in this case, none of the Land O'Lakes' activities in question rise to the level of spreading cover on a landfill for a landfill closure remedy, and none are found in CERCLA's definition of

---

[91] 152 F.3d 702, 707 (7th Cir. 1998)

[92] *See id*. at 713. The *Navistar* court did not reach the issue of whether connection of utilities, setting up trailers, constructing an access road, or clearing the site for the clay cap was sufficient to trigger the limitations period. *See id*. at n. 9. Construction of the clay cap was specifically listed as the remedy at the site, as well as in CERCLA's definition of "remedial action." *Id*. at 711, 713.

[93] *See* Def. Mot. at 29 citing *Shaefer v. Town of Victor*, 457 F.3d 188, 204 (2d Cir. 2006).

[94] *See id.*

[95] *See id*.

"remedial action." As noted, the Hudson Site remedial action was to drain ponds, dig and haul contaminated soil and sediment, and monitor groundwater. Those activities did not begin until late April 2010.

The activities Land O'Lakes claims are remedial action construction are much more like the preliminary preconstruction activities that many courts have explicitly found are *not* construction of the remedy. For example, the *Akzo Nobel* court held that construction of staging/storage pads, excavation of approximately 235 drums, installation of sanitation and utility hook-ups, and delivery of a trailer were "merely 'preliminary' or 'preconstruction' steps and not integral steps in the implementation of the permanent remedy."[96] Similarly, in *Arco* the court found that perimeter fencing, perimeter air monitoring platforms, road improvement for temporary access, site-clearing, electricity installation, and placement of construction trailers were not "construction of the remedial action" for limitations purposes.[97]

Land O'Lakes itself acknowledged that the activities it now claims were "construction of the remedial action" were, in fact, preliminary, preconstruction activities. In the September 4, 2009 Remedial Design Workplan submitted to EPA, Land O'Lakes stated:

> *Prior to beginning RA activities*, the following types of site preparation activities will take place: grubbing, mowing, surveying and flagging and/or staking the boundaries, and as necessary, the interior sampling grids, for the following: SAOC's, visible waste, ACM, and coke tar areas. In addition, scrap metal to be removed will be marked. Fence line air monitoring may

---

[96] *See Akzo Nobel*, 990 F. Supp. at 906.

[97] 147 F. Supp. 2d at 621-22.

be established for background conditions, material and equipment staging areas will be marked, and as necessary, roads will be established for routing trucks through the Site. (emphasis added).

That same Remedial Design Work Plan explicitly recognized that the "Construction Component of the [Remedial Action]" would *follow* the "Preliminary [Remedial Action] Tasks (ACM, Metal, Drain Clean Ponds)."[98]

At the end of their memorandum in support of summary judgment, Defendants claim that scrap metal work was construction of the remedial action.[99] The foregoing excerpts from the Remedial Design Work Plan demonstrate that marking scrap metal for removal is a pre-remedial action activity. No scrap metal removal (for stockpiling on-site) occurred until March 2010.[100]

Land O'Lakes activities at the Site from August 2009 through February 2010 were, by its own admission, pre-remedial activities. Some of them were categorically removal activities. The remaining activities were preliminary, preconstruction activities that were not "construction of the remedial action."

---

[98] See Ex. 4 (RD Work Plan) at USEPA006750. This "Figure 7 – Remedial Design and Remedial Construction Schedule" demonstrate that: 1) the Remedial Action did not begin until approval of the final Remedial Design, and 2) that "preliminary" remedial action tasks were not "construction" of the remedial action. Obviously the timeline in Figure 7 slipped as there was not an approved final remedial design until April 19, 2010. See p. 17, *supra*.

[99] *See* Def. Mot. at p. 29.

[100] *See* Ex. 6, (Weekly Status Updates (Attach. 3 to the Remedial Action Report)) at USEPA0805114-126.

C.     **The United States Cost Recovery Action is Timely as to Removal Costs**

Because the remedial action was initiated within three years of completion of the removal action, the United States is also entitled to recover its removal costs in this cost recovery action. April 19, 2010 marked the end of the removal action and the earliest date for beginning of the remedial action.[101]

1.     **The "Consistency Waiver" Six-Year Statute of Limitations Does Not Apply to EPA's Removal Costs**

Subpart B unambiguously allows EPA to recover all of its removal action costs where EPA 1) initiates a remedial action within three years of completion of a removal action and 2) sues for remedial action costs within six years after initiation of physical on-site construction of the remedial action.[102]

As Defendants point out in their motion, the 10th Circuit has determined that there is only a single "removal action" and a single "remedial action" per Superfund site.[103] Thus, in this Circuit a series of removal actions is a single removal action for statute of

---

[101] This is consistent with the 10th Circuit precedent that there is one removal action and one remedial action at a Site. Even assuming that initiation of on-site physical construction of the remedial action was at the end of February 2010, completion of the removal action must have been no later than February 2007. The ROD for the Site was not issued until November 2007.

[102] *See* 42 U.S.C. § 9613(g)(2).

[103] As to the "single remedial action" prong, we note that not all circuits agree, and the United States may not agree either. But, that issue is not raised here, where the Defendants agree with the position in *Colorado v. Sunoco, Inc.*, 337 F.3d 1233 (10th Cir. 2003) that there is a single removal action.

limitations purposes. [104] When EPA engages in a remedial action, the removal action is not complete until final approval of the remedial design. Thus, in this case the removal action commenced with the Emergency Removal Action ("ERA"), continued after EPA granted a consistency waiver, and finished with completion of the remedial design in April 2010. The remedial action at this Site commenced upon approval of the final remedial design.[105]

Subpart B is clear and unambiguous. If EPA brings an action for remedial costs within six years after initiation of physical on-site construction of the remedial action it can recover its removal costs so long as the remedial action is initiated within three years after the completion of the removal action.[106] Subpart B contains no caveats, qualifiers, or exceptions as to which removal costs EPA may recover. Subpart B follows and modifies Subpart A. If the remedial action is initiated within three years after completion of the removal action, EPA can recover its removal costs – plain and simple. Subpart B does *not* say "costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph *except in cases where EPA grants a consistency waiver where the 6 year statute of limitations applies*." Subpart B applies to *all* removal actions

---

[104] *See Colorado* 337 F.3d at 1241-42. *See also United Nuclear,* 814 F. Supp. at 1562 (on statute of limitations for a series of removal actions).

[105] As discussed in detail *supra*, if this Court determines that the remedial action commenced prior to approval of the final remedial design, the earliest date upon which the remedial action could have commenced is February 28, 2010. *See* Ex. 6 (Weekly Status Updates (Attach. 3 to the Remedial Action Report)) at USEPA0805114-126.

[106] *See id.*

where EPA initiates the remedial action within three years after completion of the

removal action.[107]

Defendants argue that "Subpart B cannot be construed to extend the limitations

period for recovery of removal costs under Subpart A."[108] But that is *exactly* what

Subpart B does.

> Section 9613(g)(2)(B) [Subpart B] states that removal costs may be recovered as part of a remedial action suit, which *effectively extends the statute of limitations* to six years from the initiation of physical on-site construction of the remedial action. In other words, the limitations period may be extended if the EPA attempts to recover removal costs during a remedial action suit, rather than in a removal action suit.[109] (emphasis added).

Defendants argue that Subpart B does not revive cost recovery claims because

"Congress wrote Subpart A in mandatory rather than discretionary terms" in saying that

EPA "must" bring a cost recovery suit within six years of the consistency waiver. [110]

---

[107] *See Kelley*, 17 F.3d at 842 (holding CERCLA's statute of limitations ambiguous and therefore resorting to rule of statutory construction favoring government); *Reardon*, 947 F.2d at 1513 (allowing broad interpretation of statute of limitations so as not to bar government's CERCLA claim).

[108] *See* Def. Mot. at p. 21.

[109] *Agere Systems, Inc. v. Advance Envt'l Tech Corp.*, 602 F.3d 204, 222 (3d Cir. 2010).

[110] Defendants Motion for Summary Judgment at p. 18. Defendants can only cite to a single case in support of its interpretation of § 113(g)(2) regarding its novel "consistency waiver" argument, *Agere Systems,* 602 F.3d 204. This Court should view that case critically. At best, the Third Circuit's discussion of "consistency waiver" is pure *dicta*. First, because the parties in that case did not define "consistency waiver," the Third Circuit searched the internet for "public information" instead of reading CERCLA's statutory language, and that "public information" was an EPA action memo for a Superfund site in a different EPA region and federal Circuit (Region 6 (Louisiana), Fifth Circuit) than the site at issue in *Agere Systems* (Region 3 (Pennsylvania), Third Circuit). *Id*. at 221 n.28. Second, in discussing exceptions to CERCLA's three-year statute of limitations for removal actions, the Third Circuit noted that "[t]he two other exceptions

However, Subpart A likewise says that EPA "must" bring an initial cost recovery action within three years of completion of the removal action. Yet, Subpart B provides: "[I]f the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action [for the remedial action]." It is Defendants' interpretation of Subpart A that renders Subpart B meaningless (rather than vice versa) and would "violate[] the settled rule that [the Court] must, if possible construe a statute to give every word some operative effect."[111]

Defendants' interpretation of Subpart B would not read Subpart A out of existence as Defendants contend. For example, Subpart A applies where EPA issues a consistency waiver and never commences a remedial action.  It would also apply if EPA fails to commence a remedial action within 3 years of the removal action.

---

[one being the consistency waiver exception] to the three-year statute of limitations are *of no practical effect*. *Id*. Third, *Agere Systems* adjudicated a private party CERCLA contribution action. EPA was not a party so the court did not have the benefit of EPA's statutory interpretation or legal arguments. *See Bufferd v. Comm'r*, 506 U.S. 523, 527 n.6 (1993). Finally, the Third Circuit's *dicta* would have an entirely different effect in the Tenth Circuit (one removal and one remedial action) than the Third Circuit (multiple removal and remedial actions). *Compare Agere Systems,* 602 F.3d 204 to *Colorado*, 337 F.3d 1233. The *Agere Systems* court explicitly acknowledged that EPA's "consistency waiver" in that case applied only to one specific response action and that "all of EPA's other costs [were] not subject to the 'consistency waiver' exception." 602 F.3d at 221 n.28. Despite the flawed analysis of the consistency waiver and failure to rely on CERCLA definitions, the Third Circuit in its *dicta* did reach the proper conclusion when it stated "[i]n other words, the limitations period [for a removal action] may be extended if the EPA attempts to recover removal costs during a remedial action suit, rather than in a removal action suit." *Id*. at 223.

[111] *See, e.g., Cooper Indus., Inc. v. Aviall Servs, Inc.*, 543 U.S. 157, 166-67 (2004).

The United States' correct interpretation of CERCLA § 113(g)(2) furthers the goal of judicial efficiency and limits the need for piecemeal litigation and judicial review. It also reduces the burden on EPA (and potential defendants) by requiring only a single civil action for all costs – removal and remedial - at the Site. In the words of one court, "[n]othing in CERCLA requires that EPA expedite its activities for the benefit of potential defendants in recovery actions."[112] Besides judicial economy, by granting the EPA discretionary authority to bring only one cost recovery action this also provides the court with a fuller understanding of the interrelated cleanup actions taken at a Site.

### 2. If the Six-Year Statute of Limitations Applies at All in this Case, It Applies only to the NTCRA

The United States maintains that the six year "consistency waiver" under Subpart A statute of limitations does not apply in this case because this case is filed under Subpart B. However, if the Court decides that it does apply in any way, then, by its own terms, the consistency waiver applied *only* to the NTCRA. The document granting the waiver is titled "Request for Approval of a Consistency Exemption to the Statutory Two Million Dollar Limit for the Conduct of a ***Non-Time Critical Removal Action*** at the Hudson Oil Refinery Site[.]" (emphasis added).[113] Accordingly the consistency waiver six-year statute of limitations is separate and distinct from other removal activities at the Site and simply cannot apply to the costs for subsequent components of the removal action.

---

[112] *United States v. Chromatex, Inc.*, 832 F. Supp. 900, 902 (M.D. Pa. 1993), *aff'd*, 39 F.3d 1171 (3d Cir. 1994).

[113] *See* Def. Mot., Ex. 2.

After completion of the NTCRA, EPA undertook a series of removal activities at the Site ultimately leading to the remedial action. From 2004 through 2007, ODEQ, with support from EPA, conducted a Remedial Investigation/Feasibility Study ("RI/FS"). The RI identified the types, quantities, and locations of contaminants at the Site and FS developed ways to address the Site contamination.[114] That RI/FS culminated in a Proposed Plan for cleanup of the Site which EPA put out for public comment May of 2007 and which EPA adopted when it issued the Record of Decision ("ROD") in November 2007.[115] In February 2008, EPA sent a Special Notice letter to Defendant Land O'Lakes directing Land O'Lakes to perform the remedial design and remedial work specified in the ROD.[116] Land O'Lakes declined.[117] So, in January 2009 EPA issued Land O'Lakes a unilateral administrative order under Section 106(a) of CERCLA, 42 U.S.C. § 9606(a) which required Land O'Lakes to do the remedial design and action work at the Site.

All of these removal activities occurred *after* the NTCRA. The NTCRA consistency waiver memo does not list, discuss, or otherwise mention these subsequent activities.[118] Therefore, if the consistency waiver six-year statute of limitations applies at

---

[114] *See* Def. Mot., Ex. 4 (ROD) at p. 8 (ECF 128-8, p. 17).

[115] *See* Def. Mot., Ex. 4 (ROD) at pp. 3, 9 (ECF 128-8, pp. 12, 18).

[116] *See* Def. Mot., Ex. 63.

[117] *See* Order Granting United States Motion to Dismiss Counterclaims and Strike Affirmative Defenses (Dkt. 62) at 5.

[118] *See* Def. Mot., Ex. 2.

all here, it applies only to costs of the NTCRA. The subsequent removal activities, which were *not* part of the NTCRA, simply cannot be subject to that statute of limitations.

## **CONCLUSION**

For all of the foregoing reasons, the Court should deny Defendants' Motion for Summary Judgment.

Dated:  November 20, 2020

/s/ *Scott M. Cernich*
Scott M. Cernich
Bar Number: DC 479851
Steven D. Shermer
Asia A. McNeil-Womack
Christopher B. Witwer
Attorneys for Plaintiff United States of America
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
Telephone: 202-514-0056
Facsimile: 202-616-6584
E-Mail: Scott.Cernich@usdoj.gov